## SHIVER *v.* TIFT; *et vice versa.*

1. A railroad company engaged as a common carrier of freight and goods for hire under the laws of this State, whether incorporated or unincorporated, has the right, in the operation of trains, to make all the noises usual and necessary to the movement and working of locomotives, and will not be liable for injuries occasioned by horses driven on the highway taking fright at such noises, if it exercise the right in a lawful and reasonable manner. In crossing a much frequented street in a city, it is the duty of the company to so operate its locomotive as not unnecessarily to interfere with the rights of individuals traveling on the street by other means of travel, or to endanger such travel by unnecessary noises, frightening horses. For a breach of this duty, resulting in injury, an action will lie. The petition as amended stated a cause of action, and the amendment did not add a new cause of action.

2. It was pertinent to the issue to show that the railroad track crossed the street on a grade level.

3. Testimony of a witness that a horse was nervous and high-strung is allowable, as being within the rule which admits opinions from necessity.

4. The charter of Tifton (Acts 1890-1891, vol. 2, p. 676) authorizes that municipality to permit an unincorporated railroad company, operating as a common carrier and engaged in a public use, to lay its track across one of the streets under such conditions and restrictions as the mayor and council may impose.

5. The evidence examined; and *held,* that the court erred in directing a verdict.

AUGUST 11, 1915.

Action for damages. Before Judge Thomas. Tift ·superior court. July 7, 1914

The suit was by a widow to recover damages caused by the alleged wrongful death of her husband, due to the defendant's negligence. It was alleged that the defendant, doing business as the Tifton Terminal Company, is a common carrier under the laws of Georgia, and owns and operates a number of railroad tracks in the City of Tifton. One of these tracks is located on an alley between the First National Bank building and the Tifton Grocery Company's warehouse, and crosses Love Avenue, a public and much traveled street in the city. About five o'clock on the afternoon of August 12, 1912, the plaintiff's husband, by invitation of the driver, was riding north on Love Avenue in a buggy drawn by two horses driven and controlled by Green Nelson. They approached the track of the Tifton Terminal Company, located just north of the First National Bank and the Tifton Grocery Company's warehouse, with the intent of crossing the same. Unknown to petitioner's husband and the driver, the defendant, through his employees and agents, had one of his locomotives under steam on the track in the alley, which is seldom used. The presence of the locomotive was entirely concealed from the occupants of the buggy by the building of the Tifton Grocery Company, and its presence was not known and could not have been known by them. When the buggy was driven to a point about thirty yards from the track, the locomotive was suddenly, without warning, and with loud jarring noises and loud exhaust of steam and at a rapid rate of speed, run out of the alley and across Love Avenue, where it was well known to the defendant and his servants that people with teams were likely to be, and where they knew that, on account of the surrounding buildings, the presence of the locomotive could not be known to travelers on the street until the locomotive would be within the street. No warning was given of the approach of the locomotive by ringing the bell or blowing the whistle, or by sending some one ahead to give warning and notice to approaching travelers. On account of the noise of the locomotive and the escape of steam, and of its sudden approach and speed, the horses driven by Nelson

became frightened, and before he could control them they suddenly turned and ran away, throwing petitioner's husband out of the buggy, by and on account of which, without fault on his part, he was killed. He was 52 years of age, in good health, and was earning on an average $1,800 per year. The petitioner specifically charged the defendant with the following acts of negligence: in operating the locomotive through the alley and across a much traveled street with knowledge that many people were constantly passing with teams, without having some one in advance of the locomotive to give warning of its approach; in operating an old, noisy, rattle-trap engine, calculated to frighten horses, which did frighten the horses driven to the buggy in which petitioner's husband was riding; in running the locomotive out of the alley into a much traveled public street without ringing the bell and without giving other warning of its approach; in allowing a heavy exhaust and escape of steam from the locomotive, which the defendant's servants knew was likely to frighten horses, and which was unusual and unnecessary and not to be expected at the time when and place where the injury occurred, and which frightened the horses. A demurrer to the petition was filed, and the plaintiff proffered an amendment which was allowed. The amendment elaborated the alleged acts of negligence; and further alleged that the maintenance and operation of a private railroad through the public alley and across the public street was without authority of law, and did not and was not intended to serve any public purpose, but, on the contrary, served only the individual purpose of the defendant, and that the operation of a railroad by steam under the circumstances was an unlawful encroachment and obstruction of the street and constituted a public nuisance. The defendant objected to the allowance of the amendment, on the ground that it set forth a new cause of action; and further demurred because the petition as amended set forth no cause of action, and because there was no allegation that the husband of petitioner, at the time of the alleged injury, was in the exercise of ordinary care and diligence and could not have avoided the consequences of the alleged negligence of the defendant. The court overruled the demurrer. At the conclusion of the evidence the court directed a verdict for the defendant. The plaintiff excepted to this direction; and the defendant excepted to the overruling of the demurrer.

*F. G. Boatright, R. E. Dinsmore,* and *Perry, Foy & Monk,* for plaintiff. *Fulwood & Skeen,* for defendant.

EVANS, P. J. (After stating the foregoing facts.)

1. The case made by the petition was that plaintiff's husband, while riding in a buggy behind two horses driven by another man, was killed on account of the negligent operation of the locomotive by the defendant's servants and employees. The occupants of the buggy were driving along a much frequented public thoroughfare, where they had a right to be; and the allegation is distinct that the horses were frightened by the sudden emergence of the locomotive from the alley running across Love Avenue, without warning, and that the horses were frightened both by the sudden appearance of the locomotive within thirty yards in front of them, and by the negligent operation of the locomotive, whereby unnecessary noises were made and unnecessary exhausts of steam were emitted. According to these allegations, the proximate cause of the death of petitioner's husband was the negligence of the defendant. *Georgia Railroad* v. *Carr,* 73 *Ga.* 557; *Hill* v. *Rome Street R. Co.,* 101 *Ga.* 66 (28 S. E. 631). The main allegations of the amendment were an amplification of the allegations in the petition, with the allegation of an additional act of negligence. This does not add a new cause of action. *City of Columbus* v. *Anglin,* 120 *Ga.* 785 (48 S. E. 318).

2. During the progress of the trial the following question was propounded to a witness: "State whether or not there is anything about that track that would have attracted any one's attention to the existence of an engine some distance off." The court was informed that the witness's answer would be that said track was on a level with the streets and could not be seen by a person approaching it. The court declined to allow this answer. It was pertinent to the inquiry to determine the character of the place where the horses became frightened, as bearing upon the diligence of the respective parties at the time. If the track in the alley was obscured by houses, and was level with the street at the crossing, so as to prevent travelers approaching the track from seeing it, this information should not have been withheld from the jury.

3. A witness was asked whether the horse which was frightened and ran away was a gentle, roadworthy horse, or a nervous, high-strung horse, and he replied that it was a nervous, high-strung

horse. The objection was on the ground that this was opinion evidence. Opinions of witnesses not experts are sometimes admissible from necessity, and to prevent a failure of justice, as in questions of identity of persons, handwriting, distances, size, sounds, and the like. If the facts upon which the opinion is formed can be as well stated and described, they must be, and the jury left to form their own opinion; but where the subject-matter of the inquiry is such as can not be adequately described so as to enable the jury to form an opinion of their own, opinion testimony is permissible. *Taylor* v. *State,* 135 *Ga.* 622 (70 S. E. 237). Testimony of a witness that the horse at the time of the accident did not appear to be frightened, but sulky, was held admissible, within the rule which admits opinions from necessity. Whittier *v.* Franklin, 46 N. H. 23 (88 Am. D. 185). We think it competent to show, by a witness who had observed the horse, whether he was nervous, high-strung, docile, or ordinarily roadworthy.

4. The court allowed in evidence the application of the defendant to the city council of Tifton for permission to construct railroad tracks across Love Avenue, under such regulations as council might prescribe, and the certified copy of the action of council granting the privilege. The objection urged to this evidence was, that the City of Tifton had no power to grant to an individual authority to operate engines by steam across Love Avenue. It is provided in the 19th section of the charter of the City of Tifton that the mayor and council shall have authority "to grant rights of way to railroads, street railroads, water and gas works, and electric lights, telegraph and telephone lines, throughout the streets and alleys of said city, upon such terms and conditions and restrictions as said mayor and council may by ordinance prescribe." Acts 1890-1891, vol. 2, p. 676. This charter power expressly authorizes the city to allow railroads to be constructed across its streets under such conditions and restrictions as the municipality may require. It is applicable to all railroads, whether incorporated or privately owned, so long as such railroads are devoted to a public use. It is charged in the petition that the defendant, in the operation of the railroad, was a "common carrier of freight and goods for hire, under the laws of the State of Georgia;" and the testimony of the defendant was that the Tifton Terminal Company was engaged in the business of a common carrier, and was regulated

under the rules of the State and Interstate Commerce Commission, its services consisting largely as a switching company in handling and transferring cars from one railroad company to another. A highway can not be devoted to a private use, but it may be burdened with an additional public use, so long as the second use does not materially interfere with the first use. The contention of the plaintiff is, that the Tifton Terminal Company was privately owned, that it was devoted to a private use, and that it was beyond the power of the legislature to authorize the appropriation of the streets to a purely private use, and therefore that the operation of the railroad was a nuisance per se. But the plaintiff's own allegation, as well as the undisputed evidence, was that the terminal company, though privately owned, was engaged in a public use; and we think it was within the power of the municipality of Tifton to grant a right of way to construct a railroad track across Love Avenue, so long as it did not materially interfere with the use of that street as a public highway; and there is no contention of inconsistent use.

5. Complaint is made that the court erred in directing a verdict for the defendant. It appeared that the husband of the plaintiff, by invitation of the driver, was riding with the owner of the horses, as the latter's invited guest; that the owner of the horses had had much experience in driving horses, and was a skilled driver; that at the time of the injury they were driving towards their home, along Love Avenue, a much traveled public street in the City of Tifton. As they approached the railroad track, and were in about thirty yards of it, an engine of the defendant, suddenly and without warning, was run out from the alley into the street. They had not seen the engine, on account of buildings which obstructed the view. The engine was making loud, unusual, and unnecessary noises, steam was escaping, and no flagman or other person preceded it so as to give warning of its approach; and the horses became suddenly frightened and turned around, throwing the plaintiff's husband out of the buggy and killing him. The evidence was conflicting as to the character of one of the horses. Some of the witnesses described this horse as nervous, wild, dangerous, and unsafe. Others described it as being safe; and the driver testified that he owned the horse, and had never had any previous trouble, except one time when the horse was frightened at the depot; that

on one occasion he had left the horse unhitched in the street while he went into a store, and that it had not tried to run away. Even if the horse was a high-strung and nervous horse, the driver had the right to drive that horse on the public highway. A person has a right to travel on a highway, and there is no rule of law which prevents him from driving a nervous, high-strung horse. *City of Rome* v. *Suddeth*, 116 *Ga*. 649 (42 S. E. 1032). "At grade crossings the traveler on the highway and the railroad company enjoy a common privilege on the highway itself, and each must use such privilege with due regard to the safety and rights of the other. This obligation requires the railroad company, in approaching a grade crossing, even in the absence of a positive statute to that effect, to exercise proper precautions to prevent injury to a traveler on the crossing, or who is about to cross, or who has just crossed." *Barton* v. *Southern Railway Co.*, 132 *Ga*. 841, 843 (64 S. E. 1079, 22 L. R. A. (N. S.) 915, 16 Ann. Cas. 1232). It was a question for the jury to determine whether the plaintiff's husband lost his life on account of the horse's becoming frightened by the negligent operation of the defendant's locomotive, and whether he was guilty of any contributory negligence which debarred him from a recovery. As to these matters the evidence was conflicting, and the court should have left their solution to the jury.

*Judgment reversed on the main bill of exceptions, and affirmed on the cross-bill. All the Justices concur.*